## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 21 2019, 6:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: T.W. and Z.C., Minor Children, <br><br> J.H., Mother, <br><br> *Appellant-Respondent*, <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner*. | June 21, 2019 <br><br> Court of Appeals Case No. 18A-JT-3046 <br><br> Appeal from the Wabash Circuit Court <br><br> The Honorable Robert R. McCallen, III, Judge <br><br> Trial Court Cause Nos. 85C01-1807-JT-11 85C01-1807-JT-12 |

**Brown, Judge.**

[1] J.H. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, T.W. and Z.C. (the "Children").[1] We affirm.

## Facts and Procedural History

[2] On March 20, 2017, the Department of Child Services ("DCS") filed petitions in cause numbers 85C01-1703-JC-27 ("Cause No. 27") and 85C01-1703-JC-28 ("Cause No. 28") alleging respectively that T.W., born on December 3, 2003, and Z.C., born on July 24, 2014, were children in need of services ("CHINS"). The petitions stated that DCS received a report alleging that Mother and other adults in the home were making methamphetamine, that she submitted to drug screens on March 13 and 14, 2017, that the results were positive for methamphetamine and the March 14, 2017 drug screen revealed a higher level of the drug "indicating that [she] had used Methamphetamine in the time between the two screens," and that the Children had been removed from her.[2] Appellant's Appendix Volume II at 98-101.

[3] On April 7, 2017, a status hearing was held in which Mother admitted the allegations and the Children were adjudicated CHINS. On May 22, 2017, the court entered dispositional orders awarding DCS wardship over the Children and ordering Mother, among other things, to: contact the family case manager every week to monitor compliance with the CHINS matters; enroll in any

---

[1] The court also terminated the parental rights of Z.C.'s father as to Z.C., and he does not appeal the termination.

[2] Family case manager Jennifer Lane testified that the Children were removed on March 17, 2017.

program recommended by the family case manager or other service provider program in a reasonable time, not to exceed thirty days, and participate in it as scheduled; keep all appointments with any service provider, DCS, or court appointed special advocate or guardian ad litem, or give advance notice and good cause for the missed appointment; not use, consume, manufacture, trade or sell any illegal controlled substances; obey the law; complete a parenting assessment and successfully complete all recommendations; complete a substance abuse assessment, follow all treatments, and successfully complete all treatment recommendations; submit to random drug screens; attend all scheduled visitations with the Children; and participate in the Drug Court program if she tested positive on another drug test.

[4]     On July 13, 2018, DCS filed petitions for termination of Mother's parental rights as to the Children. On October 17, 2018, the court held a factfinding hearing which began with a request by DCS's counsel for the court to take judicial notice of several cases involving Mother and Z.C.'s father. The court took notice of the CHINS matters in Cause Nos. 27 and 28 and of Mother's pending charges under cause number 85D01-1810-CM-1114.[3] It also took notice that she had resolved cause number 85D01-1709-CM-1134 "apparently . . . by a pretrial diversion" and had pled guilty on February 1, 2008, to a

---

[3] When the court asked DCS whether it knew what the pending charges under cause number 85D01-1810-CM-1114 were, DCS's counsel answered, "I believe it's driving while suspended with a prior conviction." Transcript Volume II at 18. Mother later indicated that she had not driven "since I got pulled over the last time" "[i]n August" and answered affirmatively when the court asked if that was "what the charge downstairs" was. Transcript Volume III at 5.

violation of restriction on sale of ephedrine under cause number 43D02-0708-CM-1331; on March 26, 2009, "to dealing in methamphetamine within one thousand feet of a school and neglect of a dependent" under cause number 43C01-0802-FB-46; on August 25, 2011, to possession of precursors as a level D felony under cause number 43C01-1101-FB-1; and on October 25, 2011, to dealing in methamphetamine as a level B felony under cause number 43C01-1103-FB-140.[4] Transcript Volume II at 19.

[5] Sandra Whitworth-Miller, T.W.'s grandmother and current placement, testified that T.W. was doing wonderful, her grades were up and her attendance perfect, that she belonged to the dance team at school, and that her behavior was "getting better every day." *Id.* at 103. She testified that Z.C. left placement with her in June 2017, that she made personal efforts to have the Children see each other "[a]s often as possible" with them "get[ting] together on Sundays like every other week or so up at the park," and that T.W. talks to Z.C. on "Messenger, video talk, . . . a couple of times a week." *Id.* at 108. She indicated that it was her intention to adopt T.W., that she "[a]bsolutely" had the means to take care of her," and would "absolutely" continue to make efforts to have T.W. see Z.C. *Id.* Mental health therapist Keely King testified that Mother canceled eight individual therapy sessions and did not show up to another thirteen and indicated that she missed more appointments than she had attended. Court

---

[4] DCS's counsel indicated she had the charging information in front of her, stated, "[t]he 43C01-1103-FB-140 was a B felony" and "43C01-1101-FB-1 was a D felony," and answered, "A felony," when asked if she knew about "the 0802-FB-46." Transcript Volume II at 19.

Appointed Special Advocate Karen Cole ("CASA Cole") indicated that Z.C. was currently placed with his paternal aunt in Nappanee, that she visited both of the Children in their current placements once a month and all of their needs were being met, and that Z.C. seems to be much happier now, was "more familiar with the people that he's with because . . . they're family," and "gets along great with . . . the kids there." *Id.* at 153-154. She testified "[n]ot much, if any," when asked if she thought, in total, that Mother has benefitted from services. *Id.* at 153. She stated that T.W. did not think visitation with Mother was appropriate because it upset Z.C., that when she took the case T.W. "was more of the mother figure, wanting to correct [Z.C.] all the time and . . . take care of him," that if they were to return home, T.W. would "take on that mother role again," and that she had a problem with that because T.W. "is a teenager and she needs to be a teenager." *Id.* at 154-155. She testified that she agreed with termination and, when asked what was in the Children's best interest, she answered, "[t]o be where they're at . . . be adopted where they're at so they have stability." *Id.* at 156. When asked about the basis for her recommendation, she stated, "I just don't think going back into the home is good for [the Children] right now. I don't think that it ever will be." *Id.* at 156-157.

[6] Family Case Manager Jennifer Lane ("FCM Lane") testified that Mother did become engaged in individual therapy "but her participation . . . was not what . . . was recommended." *Id.* at 167. She indicated that Mother was not usually compliant and cooperative in completing drug screens and testified that she would show up to the screens, become upset and angry, yell and curse at the

secretary to make the process go faster, and not follow the proper procedure. She detailed an incident in which Mother came to the office when she was not scheduled to have a drug screen, insisted on taking one, and pushed on the door as FCM Lane was attempting to remove her. She testified that Mother had not "taken advantage" of the ample opportunity "to get herself engaged" in substance abuse treatment through the Bowen Center and had not "even made the first step to admit that she has a problem," which was "really concerning with that amount of treatment." *Id.* at 200. She indicated that Mother's supervised visits with Children were suspended as a result of her positive drug screens and that the visit prior to her last visit in August 2018 occurred in May 2018. She recommended that Mother's parental rights be terminated because "at this point the best plan for T.W. and Z.C. would be to be adopted by their respective placements" and that termination was in their best interests because she "has not even made the first step towards solving the issues she has" and the Children "were not safe in her home then [and] wouldn't be safe in her home now." *Id.* at 200-201. During cross-examination, she indicated that she believed Mother was recommended through her substance abuse assessment to work through the MRT book, that Mother "was very inconsistent with attendance at services," and that she did not think that MRT ever was started.[5] *Id.* at 203.

---

[5] Therapist King testified that MRT was a curriculum that stood for "Moral Reconation Therapy" and was a twelve-step process of "identifying patterns, . . . developing new goals, new ways of viewing life." Transcript Volume II at 40.

[7] The court admitted into evidence Mother's drug screens as DCS Exhibits 1-32. DCS Exhibits 21-23 contain various screens from Forensic Fluids Laboratories indicating Mother tested positive for amphetamine and methamphetamine on March 13 and 14, and May 16, 2017. DCS Exhibits 1-20 and 24-32 contain various screens indicating she tested positive for amphetamine and methamphetamine on twenty-nine occasions from February 2 to October 10, 2018.

[8] On November 15, 2018, the court continued the hearing. FCM Lane testified that, following the previous hearing, she clarified with Mother that she needed to continue checking in daily for drug screens and that she had not checked in or taken any screens since October 18, 2018. Mother testified that she was currently staying at the halfway house, Women in Transition, since October 22, 2018. When asked, "[b]ut your name was previously [J.Ha.], correct," Mother answered, "[y]es. There's several." *Id.* at 240. She agreed that the first drug screen following the Children's removal was positive and answered "[t]hat's what they say" when asked if the second drug screen was positive. *Id.* at 245. She answered in the negative when asked if she had any reason to dispute Exhibits 1-32.

[9] On November 19, 2018, the court issued an order terminating the parent-child relationship between Mother and the Children and citing her drug use, recent criminal charge and criminal history, including "43C01-0802-FB-46 (Guilty Plea 3/26/09, Dealing in Methamphetamine)," her inconsistent attendance in counseling sessions and parenting time and "little real progress[] especially

towards the most important goal of reunification" with the Children, her mixed relationship with the Children, and her lack of engagement in services since the first hearing. Appellant's Appendix Volume II at 52, 54. It further indicated that DCS had a satisfactory plan including adoption and pre-adoptive services for the Children's care and treatment.

### *Discussion*

[10] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[11] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative – in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[12] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v.*

*California*, 386 U.S. 18, 87 S. Ct. 824 (1967))).  "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'"  *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))).  "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence."  *Id*. at 640.

[13]  We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).  Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied.  *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[14]  Mother disputes the court's general findings that she will not change her ways and argues that she "could demonstrate that there was a very reasonable probability that [she] could, and would, ultimately remedy the conditions" which caused the Children's removal.  Appellant's Brief at 23.  She concedes that she does have a criminal history as noted in the termination order and contends that it further noted she admitted to the CHINS allegations and that no evidence was presented demonstrating that she was making methamphetamine in her home, that she made progress in her treatment,

"[n]amely, from late 2017 through early 2018" when she was not testing positive for methamphetamine and planned to increase her parenting time, and that she engaged in individual therapy. *Id.* at 21. She maintains that, prior to the factfinding hearing, she took it upon herself to take steps to address substance abuse and mental health issues, that she was on the right track through the time of the termination hearing, and that she should have been afforded additional time to complete her halfway house program and MRT. She argues that it is in the Children's best interest that she be afforded the ability to implement services with DCS and be given time to demonstrate that she can be a parent. DCS asserts that Mother did not participate in a majority of the referred services, did not consistently attend individual counseling, and tested positive for methamphetamine throughout a majority of the case.

[15] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.*

Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, drug abuse, history of neglect, failure to provide support, lack of adequate housing, and the services offered by DCS and the parent's response to those services. *See id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

To the extent Mother does not challenge certain findings of fact, the unchallenged facts stand as proven.[6] *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

The record reveals that the Children were removed from the home in March 2017 and that Mother struggled with substance abuse at that time, has not been compliant or cooperative in completing required drug screens, and has tested

---

[6] Mother does not provide a separate statement of facts under a separate heading. *See* Appellate Rule 46(A).

positive for illegal substances on thirty-two occasions in 2017 and 2018. Mother pled guilty in 2008 to a violation of restriction on sale of ephedrine, in 2009 to dealing in methamphetamine within one thousand feet of a school, and in 2011 to possession of precursors and dealing in methamphetamine. To the extent that Mother points to engagement in services, we note FCM Lane's testimony that she had not taken advantage of opportunities to become engaged in substance abuse treatment and that she was inconsistent with attendance at services. Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied.

[19] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would

impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[20]     CASA Cole testified that she agreed with termination and thought adoption to be in the Children's best interest "so they have stability." Transcript Volume II at 156. FCM Lane recommended that Mother's parental rights be terminated and that termination was in the Children's best interests because she "has not even made the first step towards solving the issues she has" and the Children "were not safe in her home then [and] wouldn't be safe in her home now." *Id.* at 200-201. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence.

[21]     To the extent Mother argues that DCS does not have a satisfactory plan for the care and treatment of the Children, we note that adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind.

Ct. App. 2004), *trans. denied*. Whitworth-Miller, T.W.'s grandmother, testified about T.W.'s improvements in the placement with her, her efforts to help foster T.W. and Z.C.'s relationship, and that she would continue to make efforts for the Children to see each other. CASA Cole testified about Z.C.'s placement, and both she and FCM Lane indicated that it was in the Children's best interest to be adopted in their respective current placements.

[22] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[23] Affirmed.

May, J., and Mathias, J., concur.